PAUL v. DE CARRIE.

1. APPEAL AND ERROR—EVIDENCE.

Where it was undisputed and plaintiff had testified repeatedly that defendant had occupied plaintiff's premises for several years without a written lease, the exclusion of his similar testimony on redirect examination did not destroy the effect of his previous testimony.

2. TRIAL—ARGUMENT OF COUNSEL—STATEMENT OF FACT.

The statement of an undisputed fact by counsel for defendant in his argument, over exception, was not error.

3. SAME—INSTRUCTIONS.

The charge as to the making of an alleged contract between the parties was not erroneous where cautionary, only, and not calculated to exalt the contentions of either party or be prejudicial to plaintiff.

Error to Wayne; Mandell, J. Submitted April 6, 1917. (Docket No. 64.) Decided May 31, 1917.

Assumpsit in justice's court by John P. Paul against Annie E. De Carrie for rent. There was judgment for defendant, and plaintiff appealed to the circuit court. Judgment for defendant. Plaintiff brings error. Affirmed.

*James H. Pound,* for appellant.

*Albert E. Sherman,* for appellee.

In justice's court plaintiff filed a written declaration, averring:

That he was owner of certain premises and rented the same to defendant and one Oliver De Carrie by the month, "and they remained there for a time." "That defendant became the tenant of said premises, and promised to keep the same in good repair, and that she, the said Annie De Carrie, and the said Oliver De Carrie, being tenants thereof by the month. That upon a certain day, to wit, May 1, 1915, the defendant, who claimed to own all the furniture in the said building, came to plaintiff, and proposed to him to allow her (defendant) to sell the furniture in the said building No. 103 Montcalm Street East, to a Mrs. Gallagher, she (defendant), Annie E. De Carrie, then and there offering plaintiff, if he would consent to said transfer, and accept the said Gallaghers as tenants, and consent to said transfer of possession to pay him, said plaintiff, the sum of $200 for the transfer of said holding, so that defendant could sell her property in said house as a going concern, as a rooming house, also to compensate plaintiff for certain property connected with the said rooming house, to wit, the spindles of the stairways, and the lamps, in front of building, and for general dilapidation above reasonable wear and tear.   *   *   *

"And plaintiff avers that he, being tendered such an offer by the defendant, accepted the same, and agreed to, and did, consent to the transfer of such tenants, whereby he avers that defendant made large gains in her own property, and that he (plaintiff) became entitled to claim of and from the defendant the full sum of $200 for and in consideration of his consenting to said transfer or exchange of tenants, and for, and in full, to the injuries of his property, and its loss of reputation, purposely caused by defendant to said building."

In the circuit court, when plaintiff rested his case, he had offered testimony tending to prove that he

owned the particular premises; that he rented them when they were new to Mr. De Carrie, defendant's husband, from month to month; that the building had been erected five or six years, during all of which time, with the exception of a few months, the De Carries had occupied it, paying rent therefor; that defendant, in the month of May, 1915, applied to him, stating that she had a party who wanted to buy her out and as to what was said and done he personally testified, upon direct examination, as follows:

"I told her then that it was all right to make the change, and we got talking, and I said, 'Mrs. De Carrie,' I said, 'that house is in pretty bad shape there now, and, when you got it, it was a brand new house, and it will cost me between $300 and $400 to fix it up,' and I said, 'You ought to be able to give me something out of it to help pay the expenses of repairing the house.' And she said she was to get $1,100, and I told her, 'I think $200 would be a fair profit,' and we agreed upon it. And she told me that she would pay me the next day. And the next day came, and she telephoned my daughter and said she was called out of the city, and in a few days she would be back. I never got the money, neither did I see her the next day. I never got any part of it. She never come to see me, nor make any explanation to me afterward about the money. I think this talk took place in May.

"Q. As a matter of fact, how long did she remain in the house after she agreed to give you the money?

"A. I think about a week.

"Q. And she put in her place who?

"A. A lady by the name of Mrs. Gallagher.

"Q. Was that the person she was talking about at that time to you?

"A. Yes.

"Q. During the time that she was having this conversation with you, who else was in the room with you, if any one?

"A. My daughter, Nettie. I have two. There was none of the rest of the family in the house at the time that I know of."

On cross-examination he said:

"*Q.* You had a conversation in which she agreed
to pay you $200. Is that what you testified?

"*A.* Yes, sir; she agreed.

"*Q.* What was the $200 for?

"*A.* She agreed to give me $200 the next day.

"*Q.* Was not that $200 what they call a bonus?

"*A.* No, nothing said about a bonus at that time.

"*Q.* Didn't you testify in the lower court that this
$200 was a bonus?

"*A.* No.

"*Q.* Are you positive about that?

"*A.* Yes, sir; that I know.

"*Q.* Wasn't the question asked you, if you did not
consider that a bonus, and you said, 'yes'?

"*A.* No, you tried to make it appear that way, and
I said it was not a bonus.

"*Q.* Have you anything in writing for this $200
that you say she promised?

"*A.* No. I took her word for it.  *  *  *

"*Q.* What was the $200 for?

"*A.* Part pay for the decorations and repairing the
building.

"*Q.* Did you have any agreement with the De Car-
ries, either with Mr. or Mrs. De Carrie, about deco-
rating or repairing.

"*A.* I did with De Carrie when he first entered the
house.  *  *  *

"*Q.* When De Carrie occupied this house, as far as
the repairs on the interior they were to make, they
did make practically all the repairs?

"*A.* Partly. I made some repairs, on and off. Mr.
De Carrie was my tenant.

"*Q.* This suit was brought against Mrs. De Carrie?

"*A.* Yes, sir; she owned the furniture and Mr. De
Carrie owned the tenancy of the house.

"*Q.* You did not know that?

"*A.* Mrs. De Carrie told me this, and Mr. De Carrie
told me the other.

"*Q.* Mr. De Carrie was the one who rented the house
from you?

"*A.* In the first place, yes."

On redirect examination he said:

"*Q.* When she came and told you about selling out,

was it a simple transfer of the tenant, or a transfer of her furniture?

"*A.* A transfer of the tenancy. I had nothing to do with her furniture and I told her she could sell out the furniture or move it out, if she wanted. I had another party who wanted the house, and she told me if she had to take the furniture out she would lose it all, because her furniture was so bad, and she agreed to give $200, and come down the next day. * * *

"*Q.* Will you state whether or not the house was injured, or was in a good condition, when Mrs. De Carrie turned it over?

"*A.* It was brand new when the De Carries got it.

"*Q.* How was it when the De Carries got out of it?

"*A.* The house was in an awful bad condition."

Plaintiff's daughter testified with reference to the alleged arrangement:

"*Q.* What took place, if you know, between your father and Mrs. De Carrie, in the dining room?

"*A.* Mrs. De Carrie came out and said she had a tenant in the other room, and wanted to see my father. She had a tenant that would take her furniture if father would accept her as a tenant, and she hoped that he would not stand in the way of her selling the furniture to the tenant; that she had to get out of the house. And my father said the house was in pretty bad condition, and 'it will cost me quite a bit to put it in shape again for the tenant,' and he said, 'I have several that want the house.'

"*Q.* Did she sav anything about what the price was to be?

"*A.* Yes, sir. She said, 'I will give you $200 if you will accept the tenant.'

"*Q.* What was said by her, if anything, what she was to sell the place for—her furniture?

"*A.* For about $1,100.

"*Q.* What did your father say when she made the proposition?

"*A.* He said, 'All right, all right, he would accept her proposition.' And with that Mrs. De Carrie said she would send the money the next morning.

"*Q.* After she got your father's consent, what was done, if anything more?

"*A.* They went into the room and met Mrs. Gallagher. Into the sitting room. It was not the adjoining room, but two rooms apart.

"*Q.* Did you go along with them into the sitting room, or did you stay back?

"*A.* I went as far as the door with my father, and he was introduced to Mrs. Gallagher, as the lady that wanted the house, and I went out to the dining room again.

"*Q.* Did your father accept her as a tenant there?

"*A.* Yes, sir."

On cross-examination she said:

"*Q.* What was the $200 for?

"*A.* That was for allowing Mrs. De Carrie to sell out to this party.

"*Q.* To sell out to Mrs. Gallagher?

"*A.* Yes, sir.

"*Q.* You know your father did not give Mrs. De Carrie a lease?

"*A.* No, sir.

"*Q.* You know that $200 was what was ordinarily called a bonus?

"*A.* No, sir.

"*Q.* Tell what was said?

"*A.* Mrs. De Carrie asked my father if he would allow her to sell her furniture and accept this tenant, this party that she brought as a tenant to buy her out.

"*Q.* What did he say?

"*A.* He said the house was in such a bad condition; that he had other parties that would give a good deal more rent for the house, and he would have to fix it up, the place was in such a bad condition. And Mrs. De Carrie said she would give him $200.

"*Q.* For what?

"*A.* If he would accept this party as a tenant and allow her to get rid of the furniture, which would be a heavy loss to her, if she had to move it out and put it in storage.

"*Q.* What did Mrs. De Carrie say?

"*A.* She said she would be over the next morning and bring the $200.

"*Q.* Nothing put in writing at that time?

"*A.* No, sir."

A son of plaintiff testified, in substance, that nothing was spent by plaintiff to put the house in repair for Mrs. Gallagher, but he said it would have cost about $300 to put the house "in ordinary shape."

Defendant was a witness, and as to the particular interview testified:

"I went in and sat down, and said I had a tenant for them, and as far as I knew they looked like responsible people, and nice people to get along with, and he understood that my health was failing, and he said as long as they were nice tenants, and capable of taking care of the house all right, and he went in and accepted the woman's rent, $150, and gave a receipt for it, and bid us—said good-bye. and we went out.

"Q. Did you say at any time that you would pay $200?

"A. Certainly, I did not."

This she reaffirmed on cross-examination. It appeared further that Mrs. Gallagher moved into the house May 13th. The record shows the following:

"During the argument of the counsel for the defendant, Mr. Sherman, arguing that plaintiff 'De Carries had been in there about four or five years, and there has been no question about that.'

"Mr. Pound: 'I take an exception to that.'

"It was stricken out.

"And again, further, Mr. Sherman said, 'They got up; they got together and fixed up a story to get her to pay for the privilege of selling her own furniture; if there was to be any money to pay, it should be the other way.'

"Mr. Pound: 'An exception.' "

Plaintiff requested the court to charge the jury:

"I. Under the pleadings and evidence in this case, you are directed to render a verdict for the plaintiff for the sum of $200 and interest at 5 per cent. per annum since.

"II. It is agreed that the plaintiff is the owner and landlord of the premises No. 103 Montcalm street east with no fixed tenure, except month by month; that.

being so, at the end of each month defendant's tenancy terminated.

"III. That the rent being paid monthly, the longest defendant and her husband could stay was 30 days from notice, and defendant having said that she had given 30 days' notice, 2 months in fact, her time was up May 15, 1915.

"IV. That it was then at plaintiff's pleasure whether he would renew or permit a change of tenants, and, if he did so, upon what terms he would agree so to do.

"V. He, the plaintiff, had the right to refuse to consent to the change of tenants or defendant and her husband remaining any longer there. This was his privilege, and it was a valuable privilege which he could sell or keep, insist upon or waive, as he pleased. It was his right and property, and defendant had no right whatsoever to complain thereof.

"VI. It is undisputed that plaintiff consented to the change. Why did he do so? If you find that the defendant, to obtain the consent of plaintiff, promised to pay him $200, as he claims, for stated damages or bonus, that is a contract which they had a right to make, and is legally enforceable, and plaintiff is entitled to recover of defendant the sum of $200 and 5 per cent. interest thereon for nine months interest, or a total of $207.50.

"VII. You are to determine this case upon the evidence and nothing else. You are not to make contracts for these people, but you are sworn by your verdict to enforce those which you find they made.

"VIII. You are to survey and consider the evidence. What did Mrs. DeCarrie say to John P. Paul in the dining room of Paul's house? If you find that she offered plaintiff $200 for his consent to the transfer of her property by agreeing to pay him $200 therefor, then she is bound to pay that sum, and you should so find by your verdict.

"IX. The fact that one of these parties litigant is a woman, and the other a man, you are not to allow to influence your verdict, but you are to decide this case as though it was between two women or two men, as a matter of commerce.

"X. This case rests in a narrow compass. Did defendant promise plaintiff to pay him $200 to accept

Mrs. Gallagher as his tenant, and did he so accept her? If you believe she did so promise, then she is bound by it, and your verdict should be for the plaintiff."

The court submitted to the jury whether the agreement relied upon by plaintiff was made, saying that if it was made plaintiff should recover the sum of $200 and interest. In doing this the court referred to some of the testimony, calling attention to the fact that plaintiff, his daughter, and defendant, were not in agreement concerning what was said when the alleged arrangement was made. The language of the charge in this respect is:

"Mr. Paul says that he made the proposition that it would be $200 for the privilege of letting Mrs. Gallagher, the new tenant, take possession. The daughter says that proposition of $200 came from the defendant. The defendant says that there was no proposition that was made and accepted for the payment of $200, so, gentlemen of the jury, the three who it is claimed were present at that time do not agree as to what occurred at that interview, and it is for you to study all of the testimony in the case to see whether or not there was an understanding that was mutual. Not a proposition that was made, not an understanding on the part of one or the other of the parties to the proposed contract, but whether or not there was a meeting of the minds, or an understanding that was mutual between the plaintiff and the defendant, by which the defendant promised to pay $200 to the plaintiff in case the plaintiff permitted Mrs. Gallagher to become a tenant in place of the defendant's husband. Not only should you study the testimony that has been given with regard to what was actually said, but because there is a contradiction among the witnesses as to what was said, you may study the probabilities of the truth of either the claim of the plaintiff or the defendant from a determination of the general situation. The general situation is, as disclosed by the evidence, that Mr. De Carrie was the tenant, and that Mrs. De Carrie was the real proprietress of the house, and had charge of the furniture, and that Mr. De Carrie was a tenant from month to month, and on 30 days' notice could

have been evicted, or could leave the premises on 30 days' notice. Those facts and circumstances may be taken into consideration by you in determining the truth of the controversy here."

The jury returned a verdict for defendant, and the court refused to set it aside and order a new trial. There are 26 assignments of error.

OSTRANDER, J. (*after stating the facts*). The first assignment is based upon a ruling striking out testimony elicited on redirect examination of plaintiff. He had testified, more than once, that defendant had occupied the premises in question for several years, without a written lease, holding from month to month. The fact was not in dispute. The recross-examination and redirect examination of plaintiff, as appears by the record, and the ruling complained about, are as follows:

"Recross-examination:

"*Q.* Who did you say occupied the place at 103 Montcalm street after the De Carries left it?

"*A.* Mrs. Gallagher.

"*Q.* Did you give Mrs. Gallagher any lease?

"*A.* No, sir.

"Redirect examination:

"*Q.* What is the fact, whether or not you gave any one any lease?

"*A.* No, sir.

"*Q.* And they staid with you for years?

"*A.* Yes, sir.

"*Mr. Sherman:* I move that the last question and answer be stricken out.

"*The Court:* It may be.

"*Mr. Pound:* Note an exception."

Whatever the value to plaintiff of the fact of defendant's continued occupancy may have been, it was not lost by this ruling. The fact remained proven and undisputed.

The second, third, fourth, fifth, and sixth assign-

ments are likewise based upon rulings excluding answers to questions and are plainly without merit.

The seventh assignment is based upon the argument of counsel for defendant hereinbefore referred to. Under repeated rulings, the assignment is entitled to no notice. Furthermore, the fact stated by counsel in his argument to which the first exception was taken was, as I have already indicated, an undisputed fact in the case.

The remaining assignments relate to the refusal of the court to charge as requested, to alleged misdirection in the charge given, to the refusal of a new trial. It is especially contended that prejudicial error resulted from the statement made by the court, above set forth, in which the testimony of certain witnesses upon the vital question in the case is contrasted. A fair analysis of the charge shows no misstatement of facts. It must have been evident to an intelligent juror that whether the alleged contract was made depended upon what was said at the interview at which three witnesses were present, two of them being the parties to this suit. With or without the advice of the court, the jurors were bound to analyze the testimony of each witness and consider which would be believed. It seems to me that the advice to the jury was cautionary only and not calculated to exalt the contention of either party. The court, in substance, gave the instructions requested, excepting the first one, and I am not able to find any misdirection in the charge. The motion for a new trial is based upon no point not already considered, and it follows it was not error to refuse it.

The judgment is affirmed.

KUHN, C. J., and STONE, BIRD, MOORE, STEERE, BROOKE, and FELLOWS, JJ., concurred.